UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
-------------------------------------------------------------X
JACOB G. RODRIGUEZ,

              Plaintiff,

              - against -

CAROLYN W. COLVIN, Commissioner,
Social Security Administration,

              Defendant.
-------------------------------------------------------------X
ROSLYNN R. MAUSKOPF, United States District Judge.

**MEMORANDUM AND ORDER**
14-CV-6552 (RRM)

Plaintiff Jacob G. Rodriguez brings this action against defendant Carolyn Colvin,

Commissioner of the Social Security Administration (the "Commissioner"), pursuant to 42

U.S.C. § 405(g), seeking review of defendant's determination that he is not entitled to disability

insurance benefits under Title XVI of the Social Security Act.  Rodriguez and the Commissioner

have cross-moved for judgment on the pleadings.  (Def.'s Mot. J. Pls. (Doc. No. 22); Pl.'s Mot.

J. Pls. (Doc. No. 24).)  For the reasons set forth below, Rodriguez's motion is denied and the

Commissioner's motion is granted.

## BACKGROUND

### I.      Procedural History

Rodriguez had received Supplemental Security Income ("SSI") as a child, on the basis of

disability due to mental retardation, oppositional defiant disorder ("ODD"), and attention deficit

hyperactivity disorder ("ADHD").  (Admin. R. (Doc. No. 28) at 66, 134–35.)  As required by the

Social Security Act ("the Act"), the agency reviewed Rodriguez's case when he turned eighteen

in order to determine whether he was disabled under the SSI standard for disability pertaining to

adults ("Age 18 review").  (*Id.* at 66, 73–75.)  *See also* 42 U.S.C. § 1382c(a)(3)(H)(iii); 20

C.F.R. § 416.987. On August 4, 2011, the Social Security Administration ("SSA") informed Rodriguez that he was no longer eligible for SSI as he did not qualify as disabled under the definition of disability for adults. (*Id.* at 59–62.) On October 12, 2011, Rodriguez requested reconsideration and waived his right to appear at that hearing. (*Id.* at 63.) In a decision dated December 2, 2011, the disability hearing officer found that Rodriguez did not meet the adult standard of disability. (*Id.* at 64–72.) Rodriguez requested a hearing before an administrative law judge ("ALJ"). (*Id.* at 76–80.)

On April 3, 2012, Rodriguez received a hearing with the SSA Office of Disability Adjudication and Review in Bronx, New York. (*Id.* at 49–54.) Rodriguez appeared before ALJ Zachary S. Weiss, who advised Rodriguez of his right to have representation. (*Id.*) The hearing was adjourned so that Rodriguez could retain counsel. (*Id.* at 54.) Hearings on August 2, 2012 and December 13, 2012 were also adjourned to allow Rodriguez to retain counsel. (*Id.* at 37–42, 44–48.) On May 16, 2012, Rodriguez again appeared before ALJ Weiss without counsel and elected to proceed without a representative. (*Id.* at 25–36.) Subsequent to this hearing, Rodriguez provided additional evidence pertaining to his claim. (*Id.* at 9; *see id.* at 105–33, 295–369.) On August 16, 2013, the ALJ issued a decision that Rodriguez's childhood SSI benefits were correctly ceased as of August 4, 2011, and that he was not disabled within the meaning of the Social Security Act under the adult disability standards. (*Id.* at 6–21.) On August 25, 2014, the Appeals Council denied Rodriguez's request for review. (*Id.* at 1–4.) On October 23, 2014, Rodriguez, with the assistance of counsel, filed the instant action against defendant. (Compl. (Doc. No. 1).)

Before the Court are the parties' motions for judgment on the pleadings pursuant to Federal Rule of Civil Procedure 12(c). (Def.'s Mot. J. Pls.; Pl.'s Mot. J. Pls.) Rodriguez seeks

remand of the Commissioner's decision to deny his claim based on new and material evidence submitted after the ALJ hearing. (Pl.'s Mem. L. (Doc. No. 25) at 1, 16–23.) He also seeks remand asserting that the ALJ substituted his own personal view of the medical evidence over that of the medical professionals. (*Id.* at 1, 23–25.) Defendant argues that the Commissioner correctly found that Rodriguez's impairment did not satisfy the adult SSI disability standard as of August 4, 2011. (Def's Mem. L. (Doc. No. 23) at 22–30.) Defendant also argues that the new evidence introduced by Rodriguez does not provide a basis for remand and that the ALJ properly weighed the medical evidence. (Def.'s Reply (Doc. No. 26) at 1–8.)

## II.    Administrative Record

### a.    Non-Medical Evidence

Rodriguez was born on May 12, 1993. (Admin. R. at 16.) Rodriguez has limited work experience. He has worked on summer projects and as an intern for a catering company. (*Id.* at 31–32, 199.) Rodriguez attended school through the eleventh grade and was enrolled in special education classes. (*Id.* at 29–30.) Educational records from the New York City Board of Education reflect that Rodriguez was classified as learning disabled and had an individualized education program ("IEP"). (*Id.* at 250–60.)

At his hearing, Rodriguez testified that he had been unable to retain a lawyer because he had not been receiving treatment for an entire six months. (*Id.* at 27.) He had just started treatment two or three months earlier. (*Id.* at 28.) When asked why he could not work, Rodriguez stated that he had been told his entire life that he could not work. (*Id.* at 31.) He had worked for "Summer Youth" for three summers, starting around 2008. (*Id.*) He had liked working. (*Id.*) Rodriguez stated that he had also had an internship as a waiter for a catering company, but was fired for fighting with another employee. (*Id.* at 31–32.)

Rodriguez also testified that he takes medication for mental illness, but did not have any medication at the moment. (*Id.* at 32.) He was waiting for his doctor to re-prescribe it. (*Id.*) He said he was currently homeless and was working with the "California Center" to get housing. (*Id.*) He had stayed at a friend's house the night before the hearing. (*Id.* at 33.) He said his ability to read was "good," and he planned to sign up to get his GED. (*Id.*) He stated that he sometimes had trouble concentrating and was easily distracted. (*Id.* at 34.) Rodriguez said he got into a lot of fights, including a fight as recently as three months earlier. (*Id.*) He also stated that was getting into fewer fights as he got older. (*Id.* at 35.) He spent his days relaxing, and he liked to watch the Disney channel, cook, sing, and dance. (*Id.* at 33, 35–36.)

b. **Summary of Medical Evidence Before Age 18 Review**

On October 24, 2003, Rodriguez started outpatient therapy at South Bronx Mental Health Council ("South Bronx"). (*Id.* at 207–10.) According to his pre-admission screening interview, Rodriguez was in fourth grade, in special education classes, and was exhibiting disruptive, oppositional behavior and angry outbursts. (*Id.* at 207.) He was diagnosed with ADHD and ODD. (*Id.* at 217.) In November 2003, Rodriguez was prescribed Strattera, an ADHD medication. (*Id.* at 205.) In April 2005, Rodriguez was switched to Methylin. (*Id.*) In October 2007, he was switched to Ritalin. (*Id.* at 203.) At South Bronx, Rodriguez underwent numerous examinations and functional assessments. Findings generally included problems with aggression and temper, as well as problems in school. (*Id.* at 219–20, 229, 232.)

On March 23, 2006, Rodriguez underwent a psychological educational evaluation performed by school psychologist Zari Brasero. (*Id.* at 261–63.) He appeared eager and motivated, and he tried to complete most of the tasks presented to him. (*Id.* at 261.) Dr. Brasero administered the Wechsler Abbreviated Scale of Intelligence test, which resulted in a verbal IQ

of 91, placing Rodriguez in the 27th percentile, in the average range.  (*Id.*)  Rodriguez's performance IQ was 109, placing him in the 73rd percentile, in the average range.  (*Id.*)  His full scale IQ was 100, placing him in the 50th percentile, in the average range.  (*Id.*)  His social and emotional functioning was noted to be polite and cooperative; he got along with peers and was respectful to adults.  (*Id.* at 262.)  Dr. Brasero assessed that Rodriguez did not appear to have a major behavior problem that would interfere with his learning and social progress.  (*Id.*)

On May 23, 2008, Rodriguez's case with South Bronx was closed.  (*Id.* at 244–46.)  The reasons cited were Rodriguez's lack of commitment to treatment and a long history of non-compliance with appointments, treatment, and medication intake.  (*Id.* at 246.)   In September 2009, he was admitted back for treatment after his mother sent a letter to South Bronx.  (*Id.* at 247.)   Rodriguez testified, and evidence submitted after the ALJ's determination confirms, that Rodriguez participated in group therapy in 2009, but stopped treatment after becoming physically aggressive during a therapy session.  (Ex. C to Pl.'s Mot. J. Pls. (Doc. No. 25-1) at 93 (ECF pagination).)  Records from 2010 indicate that Rodriguez failed to show up for treatment entirely and his record was closed for "non-compliance."  (*Id.* at 95–98 (ECF pagination).)

### c.  Medical Evidence From Age 18 Review Period

In May 2011, Rodriguez turned eighteen.  He was not in treatment during the one year period after his eighteenth birthday, during which the SSA reevaluated his disability in accordance with the adult standard.  *See* 20 C.F.R. § 416.987(c).  In connection with his disability application, he saw a consultative examiner and received a consultative record review.

### i.  Edward Hoffman, Ph.D – Consultative Evaluation

On July 19, 2011, Edward Hoffman, Ph.D, performed a consultative psychological evaluation.  (*Id.* at 266–69.)  Rodriguez was eighteen years old and entering eleventh grade.  (*Id.*

at 266.)  He had repeated kindergarten and ninth grade due to academic difficulty and was

attending summer school.  (*Id.*)  Rodriguez had started special education in the third grade and

had never held a competitive job.  (*Id.*)  Rodriguez had formerly seen a psychiatrist and therapist,

but no longer took psychiatric medication.  (*Id.*)  He had never been hospitalized.  (*Id.*)

Rodriguez described his current functioning as having poor sleep with occasional

nightmares.  (*Id.*)  His appetite was fair.  (*Id.*)  He stated he felt somewhat depressed, but he

denied suicidal ideation, homicidal ideation, or hallucinations.  (*Id.*)  Rodriguez reported that he

was able to do laundry at times and he cooked for himself.  (*Id.* at 268.)  He could dial a phone,

but did no shopping.  (*Id.*)  Rodriguez rode the bus and subway independently.  (*Id.*)  He did no

reading or writing.  (*Id.*)  He took care of his personal hygiene.  (*Id.*)  Rodriguez had friends and

hobbies.  (*Id.* at 266, 268.)  He wanted to become a chef.  (*Id.* at 266.)  Rodriguez said he liked to

dance and sing.  (*Id.*)  Dr. Hoffman stated that overall, Rodriguez had adequate basic self-care

and socialization skills.  (*Id.* at 268.)

During the mental status examination, Rodriguez was cooperative, and his manner of

relating, social skills, and overall presentation were adequate.  (*Id.* at 267.)  He maintained good

eye contact and was neatly attired and groomed.  (*Id.*)  Rodriguez's speech was adequate in

speed and flow.  (*Id.*)  His thought processes were focused adequately on the interview questions

and there was no evidence of delusions, hallucinations, or disordered thinking.  (*Id.*)

Rodriguez's affect was somewhat constricted.  (*Id.*)  His mood was somewhat anxious, but

stable.  (*Id.*)  He was fully oriented and his attention and concentration were adequate.  (*Id.*)  His

recent memory was intact, but remote memory was impaired.  (*Id.*)  Rodriguez's cognitive

functioning appeared to be within the borderline range of intelligence.  (*Id.*)  He knew the name

of the president, but not the names of the mayor or former mayor.  (*Id.*)  He knew the exact date

and day of the week. (*Id.*) Rodriguez's arithmetic functioning was below average, and his insight and judgment were fair. (*Id.* at 267–68.)

Dr. Hoffman diagnosed learning problems, by history, with depressive features and borderline intellectual functioning. (*Id.* at 268.) He opined that Rodriguez could perform simple, repetitive vocational tasks and relate adequately to others. (*Id.*) He could learn in accordance with his cognitive functioning and could follow a routine and schedule independently. (*Id.*) He recommended that Rodriguez continue to receive special education and clinical services in school, as well as vocational counseling. (*Id.*) He added that, in view of Rodriguez's reported depression, he would benefit from outpatient mental health treatment. (*Id.*)

### ii. R. Nobel, Ph.D – Record Review

On August 1, 2011, R. Nobel, Ph.D, a state agency psychological consultant, reviewed the medical evidence and completed a psychiatric review technique. (*Id.* at 270–83.) Dr. Nobel stated that Rodriguez's history of learning disorder and ADHD did not satisfy the criteria for listing 12.02. (*Id.* at 271.) His impairments also did not satisfy the criteria for listing 12.08. (*Id.* at 277.) Dr. Nobel then assessed that Rodriguez had a mild restriction in activities of daily living, mild difficulties in maintaining social functioning, moderate difficulties in maintaining concentration, persistence and pace, and no episodes of deterioration of extended duration. (*Id.* at 280.) Dr. Nobel also assessed that Rodriguez did not meet the "C" criteria of the listings. (*Id.* at 281.)

Dr. Nobel completed a mental residual functional capacity assessment. (*Id.* at 284–87.) He found that Rodriguez was not significantly limited in his abilities to: remember locations and work-like procedures; understand and remember very short and simple instructions; carry out very short and simple instructions; maintain attention and concentration for extended periods;

perform activities within a schedule, maintain regular attendance, and be punctual within customary tolerances; work in coordination or proximity to others without being distracted by them; to make simple work-related decisions; interact with the general public; ask simple questions or request assistance; get along with coworkers or peers without distracting them or exhibiting behavioral extremes; maintain socially appropriate behavior and adhere to basic standard of neatness and cleanliness; respond appropriately to changes in the work setting; be aware of normal hazards and take appropriate precautions; and travel in unfamiliar places or use public transportation. (*Id.* at 284–85.) Rodriguez was moderately limited in his abilities to: understand and remember detailed instructions; sustain an ordinary routine without special supervision; complete a normal workday and workweek without interruptions from psychologically based symptoms; perform at a consistent pace without an unreasonable number and length of rest periods; and set realistic goals or make plans independently. (*Id.*) Dr. Nobel stated that he did not have enough evidence to rate Rodriguez's ability to accept instructions and respond appropriately to criticism from supervisors. (*Id.* at 285.) He opined that Rodriguez retained the residual functional capacity for at least simple tasks and substantial gainful activity. (*Id.* at 286.)

### d. Medical Evidence After Cessation Date of SSI Childhood Disability (August 4, 2011)

#### i. Urban Health Plan

On September 27, 2011, Rodriguez attended an appointment at Urban Health Plan ("UHP") at which he requested medication[1] and the completion of his SSI forms. (*Id.* at 312–13.) He received Gardasil and flu vaccines and underwent blood testing. (*Id.*)

---

[1] As best the Court can determine, it appears that Rodriguez had ceased taking medication in 2008 or 2009 and was seeking to be reinstated on the medications he had been prescribed several years earlier. His file from UHP states that he was not taking any medication at the time of his initial visit, (*id.* at 312), and Rodriguez's motion states that he did not begin treatment again until February 2012. (Pl.'s Mem. L. at 7.)

On October 7, 2011, Davin Cole, P.A., at UHP performed a physical examination. (*Id.* at 310–11.) Rodriguez said he felt well and had no acute complaints. (*Id.* at 310.) The exam revealed all normal findings. (*Id.*) P.A. Cole assessed allergic rhinitis and that Rodriguez was an otherwise well adult. (*Id.*)

On December 21, 2011, Rodriguez returned to UHP for follow up on a skin rash and to get a psychiatric referral. (*Id.* at 308–09.) Rodriguez stated that he risked losing his SSI because he had not been following up with psychiatric care. (*Id.* at 308.) P.A. Cole's examination findings were all within normal limits other than the skin rash. (*Id.*) Relevant here, he diagnosed ADHD and prescribed Hydroxyzine Pamoate (Vistaril). (*Id.* at 308–09.)

Rodriguez presented to the El Nuevo San Juan Health Center, part of UHP, on February 22, 2012 and completed a mental health assessment. (*Id.* at 292.) The following day, social worker Alicia Cartenuto performed an initial psychological assessment. (*Id.* at 302–03.) Rodriguez's affect was full and his mood was expansive. (*Id.* at 302.) He was well groomed and his behavior was hyperactive and restless. (*Id.*) His attitude was cooperative. (*Id.*) Rodriguez reported that he had not had mental health treatment since he was discharged from his last treatment group for fighting with another patient. (*Id.*) Rodriguez denied symptoms of depression or anxiety. (*Id.*) He reported problems falling asleep and nausea. (*Id.*) Rodriguez was living with his mother, sister, and brother. (*Id.*) He had dropped out of high school because of behavioral issues, including frequent physical altercations. (*Id.*) He planned on getting his GED. (*Id.*) Rodriguez said he had been involved in a number of physical altercations in the last few years, each time because of his sexual orientation. (*Id.*) During one such incident, he was arrested and was now on probation. (*Id.*) He reported wanting to see a psychiatrist to get back on medication. (*Id.*) Social Worker Cartenuto diagnosed ADHD. (*Id.* at 303.) Rodriguez was

prescribed 10 mg of Methylphenidate (Ritalin) and 50 mg of Hydroxyzine Pamoate (Vistaril) to help with anxiety.  (*Id.* at 292–93.)  Rodriguez was to follow-up in two weeks.  (*Id.*)

Rodriguez also underwent a physical examination at UHP on February 23, 2012, performed by Michelle Martin, N.P.  (*Id.* at 300–01.)  He said he had been seen two years earlier at South Bronx, but was discharged when he broke a door.  (*Id.* at 300; *see id.* at 244 (noting he was discharged in 2008).)  Rodriguez was on probation and needed to start taking medication again.  (*Id.*)  He said he had a lot of energy lately, especially at night.  (*Id.*)  An examination was within normal limits.  (*Id.*)  N.P. Martin diagnosed ODD and ADHD.  (*Id.*)  Rodriguez was prescribed Methylphenidate (Ritalin) and Vistaril.  (*Id.* at 301.)

### ii.  Carli Klinghoffer, M.D. – Institute for Family Health Center

Rodriguez presented to the Institute for Family Health Center ("Family Health") on January 23, 2013 for mental health services.  (*Id.* at 364.)  He subsequently missed appointments on January 30, February 18, and February 20, 2013.  (*Id.* at 358–59, 363.)  He saw a social worker on February 26, 2013, for an intake appointment.  (*Id.* at 355.)

On March 5, 2013, Carli Kinghoffer, M.D., saw Rodriguez at Family Health for a psychiatric evaluation and to develop a treatment plan.  (*Id.* at 350–55.)  Rodriguez stated that he had been out of treatment for two and a half years.  (*Id.* at 352.)  He reported that he was on probation for getting into a fight and that he got into frequent fights.  (*Id.*)  Rodriguez took medication for ADHD but did not recall the names of his medications.  (*Id.*)  He had not been in consistent psychiatric treatment for years.  (*Id.*)  Rodriguez reported the following symptoms: agitation, anxiety, depressed mood, paranoia, difficulty concentrating, sleep disturbances, impulsivity, and disruptive behavior.  (*Id.*)  He said he felt agitated most days, mildly anxious some days, and depressed most days, which he rated mild to moderate.  (*Id.*)  He felt labile most

days and paranoid some days.  (*Id.*)  He experienced dizziness, light-headedness, and headaches.  (*Id.* at 353.)  On mental status examination, Rodriguez's appearance, build, stature, and posture were within normal limits.  (*Id.*)  His attitude toward the examiner was confusing and cooperative.  (*Id.*)  His mood was angry, depressed, and irritable.  (*Id.*)  Dr. Klinghoffer diagnosed mood lability, depression, impulsivity, and ADHD symptoms, and made a note to rule out bipolar disorder and ADHD.  (*Id.*)  He was to follow-up in one month.  (*Id.* at 353.)

Rodriguez did not appear for his follow-up appointment.  On May 14, 2013, a counselor at Family Health called Rodriguez to discuss the need to attend appointments.  (*Id.* at 347.)  A new appointment was scheduled for June 24, 2013.  (*Id.*)

### III.    New Evidence

Rodriguez, with the help of an attorney, submitted additional medical, educational, and criminal evidence to this Court, which is summarized below.  (Pl.'s Mem. L. at 6–8, 9–11, 16–23.)

#### a.  Medical Evidence

##### i.  NYC Human Resources Administration Records

In December of 2014, Rodriguez was evaluated by NYC's Human Resources Administration (HRA) as part of a psychological social assessment to determine if he could meet the work requirements generally required for adult recipients of public assistance.  (Ex. A to Pl.'s Mem. L. (Doc. No. 25-1) at 2–29 (ECF pagination).)  There, Rodriguez reported his history of ADHD, ODD, and bipolar disorder.[2]  (*Id.* at 6 (ECF pagination).)  He also acknowledged that he had anger management issues and thoughts of hurting others, but he had not had treatment for a couple of years.  (*Id.* at 6–7, 14 (ECF pagination).)

---

[2] It is unclear from the record when Rodriguez was first formally diagnosed with bipolar disorder.

As part of the assessment, Rodriguez had a medical history and an exam at Lutheran Hospital.  (*Id.* at 13–29 (ECF pagination).)  The examining doctor diagnosed him with bipolar disorder and ADHD.  (*Id.* at 27–28 (ECF pagination).)  The doctor opined that Rodriguez had non-exertional work limitations, specifically cognitive, emotional, and interpersonal.  (*Id.* at 24–25 (ECF pagination).)  The doctor also suggested psychiatric treatment to address Rodriguez's "severe mood problems."  (*Id.* at 26–27 (ECF pagination).)

### ii.  Stacy Yearwood – Psychiatrist

Between January and March 2015, Rodriguez received treatment from Dr. Yearwood. (Ex. B to Pl.'s Mot. J. Pls. (Doc. No. 25-1) at 31–42 (ECF pagination).)  Dr. Yearwood diagnosed ODD and ADHD, as well as bipolar disorder and anxiety disorder.  (*Id.* at 42 (ECF pagination).)  She noted that he had other issues, such as "lack of primary support, sexuality, housing, educational, financial."  (*Id.* at 31 (ECF pagination).)  Dr. Yearwood completed an assessment of Rodriguez's functioning, finding a marked limitation in his ability to communicate.  (*Id.* at 32 (ECF pagination).)  She noted that he was easily agitated and had a low frustration tolerance.  (*Id.*)  She observed that due to Rodriguez's paranoia, he felt that people were talking about him and picked fights.  (*Id.*)  Dr. Yearwood also noted that his impairment could cause him to deteriorate or decompensate because of his inability to work with others.  (*Id.* at 33 (ECF pagination).)

### iii.  South Bronx Mental Health Council

Additional evidence was obtained by counsel from South Bronx detailing Rodriguez's treatment there between 2009 and 2010.  (Ex. C at 44–103 (ECF pagination).)  A psychosocial history dated September 28, 2009 details that Rodriguez had problems with anger and focus.  (*Id.* at 44 (ECF pagination).)  He was not attentive, had difficulties with others, and was

disrespectful.  (*Id.*)  He had threatened family members when upset, become explosive and aggressive when angry, ran away, and had incidents playing with fire.  (*Id.* at 46 (ECF pagination).)

In 2009, Rodriguez was prescribed Concerta and Benadryl, but he was not medication compliant.  (*Id.* at 58, 103–104 (ECF pagination).)  In 2009, his therapist noted incidents of aggression in his group sessions.  (*Id.* at 83, 85, 90–91, 93–94, 103–104 (ECF pagination).)  The last one resulted in Rodriguez becoming physically aggressive and punching a wall.  (*Id.* at 94 (ECF pagination).)  On or around April of 2010, Rodriguez was discharged from South Bronx. (*Id.* at 104 (ECF pagination).)

### b.  Education Evidence

#### i.  Committee on Special Education

Records from the Committee on Special Education reveal that when Rodriguez was ten, he underwent a psychological evaluation.  (Ex. D to Pl.'s Mot. J. Pls. (Doc. No. 25-1) at 105–11 (ECF pagination).)  The report indicates that Rodriguez attended a pre-school program and several kindergartens, even repeating one for a year.  (*Id.* at 105 (ECF pagination).)  His IQ was tested: he achieved a verbal score of 72, a performance score of 93, and a full IQ score of 80. (*Id.* at 107–08 (ECF pagination).)  The evaluator identified a language based learning disability. (*Id.*)  She also noted that he presented "as a boy who does not accept responsibility for his actions but sees himself as the victim" with indications of anxiety and impulsive behavior.  (*Id.* at 107 (ECF pagination).)

Rodriguez's New York City Department of Education IEP from 2003 indicates that his "delays require[d] significant curriculum modification."  (Ex. D-2 to Pl.'s Mot. J. Pls. (Doc. No.

25-1) at 120 (ECF pagination).)  As a result, Rodriguez received extensive testing

accommodations.  (*Id.* at 121–22 (ECF pagination).)

New York City Department of Education records from 2008 demonstrate that when

Rodriguez was in the 8th grade, he was still in a collaborative team teaching environment.  (*Id.* at

124 (ECF pagination).)  The IEP notes that Rodriguez was a "motivated student who quite often

f[ound] himself distracted during instruction" and was also "very friendly and relate[d] to his

peers and adults well."  (*Id.* at 127 (ECF pagination).)

### c.  Criminal History Evidence

Records from the Supreme Court of the State of New York, Bronx County, reveal that in

May 2009, Rodriguez was arrested and charged with assault in the third degree, resisting arrest,

unlawful possession of marijuana, and harassment.  (Ex. E to Pl.'s Mot. J. Pls. (Doc. No. 25-1) at

139–40 (ECF pagination).)  In June 2010, Rodriguez was charged with assault in the third

degree, menacing in the second degree, criminal possession of a weapon, and harassment.  (*Id.* at

141–42 (ECF pagination).)  For both arrests, Rodriguez was sentenced for assault in the third

degree as a youthful offender with an order of protection and three years of probation.  (*Id.* at

137–38 (ECF pagination).)

## STANDARD OF REVIEW

### I.    Review of Denial of Social Security Benefits

The Court does not make an independent determination about whether a claimant is

disabled when reviewing the final determination of the Commissioner.  *See Schaal v. Apfel*, 134

F.3d 496, 501 (2d Cir. 1998).  Rather, the Court "may set aside the Commissioner's

determination that a claimant is not disabled only if the [ALJ's] factual findings are not

supported by 'substantial evidence' or if the decision is based on legal error."  *Shaw v. Chater*,

221 F.3d 126, 131 (2d Cir. 2000) (quoting 42 U.S.C. § 405(g)). "'[S]ubstantial evidence' is 'more than a mere scintilla. It means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" *Selian v. Astrue*, 708 F.3d 409, 417 (2d Cir. 2013) (quoting *Richardson v. Perales*, 402 U.S. 389, 401 (1971)).

"In determining whether the agency's findings were supported by substantial evidence, the reviewing court is required to examine the entire record, including contradictory evidence and evidence from which conflicting inferences can be drawn." *Id.* (internal quotation marks omitted). "If there is substantial evidence in the record to support the Commissioner's factual findings, they are conclusive and must be upheld." *Stemmerman v. Colvin*, No. 13-CV-241 (SLT), 2014 WL 4161964, at *6 (E.D.N.Y. Aug. 19, 2014) (citing 42 U.S.C. § 405(g)). "This deferential standard of review does not apply, however, to the ALJ's legal conclusions." *Hilsdorf v. Comm'r of Soc. Sec.*, 724 F. Supp. 2d 330, 342 (E.D.N.Y. 2010). Rather, "[w]here an error of law has been made that might have affected the disposition of the case, [an ALJ's] failure to apply the correct legal standards is grounds for reversal." *Pollard v. Halter*, 377 F.3d 183, 189 (2d Cir. 2004) (internal quotation marks omitted).

## II.     Eligibility for Disability Benefits

To qualify for disability insurance benefits, an individual must show that she is unable "to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(2)(A). This requires a five-step analysis for determining whether a claimant is disabled:

> [1] First, the Commissioner considers whether the claimant is currently engaged in substantial gainful activity.

[2] If he is not, the Commissioner next considers whether the claimant has a "severe impairment" which significantly limits his physical or mental ability to do basic work activities.

[3] If the claimant suffers such an impairment, the third inquiry is whether, based solely on medical evidence, the claimant has an impairment which is listed in Appendix 1 of the regulations. If the claimant has such an impairment, the Commissioner will consider him *per se* disabled.

[4] Assuming the claimant does not have a listed impairment, the fourth inquiry is whether, despite the claimant's severe impairment, he has the residual functional capacity to perform his past work.

[5] Finally, if the claimant is unable to perform his past work, the Commissioner then determines whether there is other work which the claimant could perform.

*Talavera v. Astrue*, 697 F.3d 145, 151 (2d Cir. 2012) (quoting *DeChirico v. Callahan*, 134 F.3d 1177, 1179–80 (2d Cir. 1998)); *see also* 20 C.F.R. §§ 404.1520, 416.920. The claimant has the burden of proof for the first four steps of the analysis, but the burden shifts to the Commissioner for the fifth step. *See Talavera*, 697 F.3d at 151.

When a minor in receipt of disability benefits reaches the age of 18, the Commissioner must "redetermine . . . eligibility . . . by applying the criteria used in determining initial eligibility for individuals who are age 18 or older." 42 U.S.C. § 1382c(a)(3)(H)(iii); *see also* 20 C.F.R. § 404.1520, pt. 404, subpt. P, app. 1, pt. A. The review is conducted during a one-year period beginning on the recipient's eighteenth birthday. 20 C.F.R. § 416.987(c). In the redetermination of eligibility, the SSA uses the same analysis for reviewing new adult (individuals age 18 or older) applications for disability, except that the first step is omitted. *See* 20 C.F.R. § 416.987(b).

## DISCUSSION

### I.        The ALJ's Determination

Here, the ALJ properly engaged in the analytical framework outlined above and his determinations are supported by substantial evidence.  Beginning at step two, the ALJ found that since August 4, 2011, Rodriguez has had severe impairments due to ADHD and ODD.  (Admin. R. at 11 (citing 20 C.F.R. § 416.920(c)).)  The ALJ found that the impairments cause more than minimal functional limitations and therefore are properly considered severe under the Regulations.  (*Id.*)

At step three, the ALJ found that Rodriguez did not have an impairment or combination of impairments that met or medically equaled the severity of one of the impairments listed in Appendix 1 of the Regulations.  (*Id.*)  The ALJ considered Rodriguez's impairments against listings § 12.02 and § 12.08 of Appendix 1, which cover "Organic Mental Disorders" and "Personality Disorders."  *See* 20 C.F.R. pt. 404, subpt. P, app. 1, §§ 12.02, 12.08.  To meet or medically equal the impairments of listing § 12.02 or § 12.08, a claimant's impairments must satisfy at least two of the following paragraph B criteria: marked restriction of activities of daily living; marked difficulties in maintaining social functioning; marked difficulties in maintaining concentration, persistence, or pace; and repeated episodes of decompensation, each of extended duration.  *See* 20 C.F.R. pt. 404, subpt. P, app. 1, §§ 12.02(B), 12.08(B).  The ALJ noted that "[a] marked limitation means more than moderate but less than extreme."  (Admin. R. at 12.) *See* 20 C.F.R. § 416.926a.  He further noted that "[t]he term repeated episodes of decompensation, each of extended duration, means three episodes within 1 year, or an average of once every 4 months, each lasting for at least 2 weeks."  (*Id.* at 12.)  *See* 20 C.F.R. pt. 404, subpt. P, app. 1.  Here, the ALJ concluded that Rodriguez's impairments did not satisfy the paragraph B

criteria.  (Admin. R. at 12–13.)  He largely based his determination on Rodriguez's own statements about his activities of daily living, reports of Rodriguez's mother, and on the opinion of the state agency psychologist R. Nobel.  (*Id*.)

If an impairment fails to satisfy the paragraph B criteria, a claimant may still meet the requirements of listing § 12.02 if he can meet the criteria listed in paragraph C of that section. Under § 12.02(C) he must show a:

> [m]edically documented history of a chronic organic mental disorder of at least 2 years' duration that has caused more than a minimal limitation of ability to do basic work activities, with symptoms or signs currently attenuated by medication or psychosocial support, and one of the following:
> 1. Repeated episodes of decompensation, each of extended duration; or
> 2. A residual disease process that has resulted in such marginal adjustment that even a minimal increase in mental demands or change in the environment would be predicted to cause the individual to decompensate; or
> 3. Current history of 1 or more years' inability to function outside a highly supportive living arrangement, with an indication of continued need for such an arrangement.

The ALJ found that the record evidence failed to establish the presence of any of the paragraph C criteria.  (*Id*. at 12.)  The ALJ found that there was no evidence on the record of repeated episodes of decompensation of extended duration, residual disease process, or history of inability to function outside of a highly supportive living environment.  (*Id.*)

At step four, the ALJ assessed Rodriguez's residual functional capacity ("RFC") and determined that he could "perform a full range of work at all exertional levels" limited to "basic mental work activities" that "are unskilled, simple, and repetitive."  (*Id.* at 13.)  In making this determination, the ALJ considered "all symptoms and the extent to which these symptoms can reasonably be accepted as consistent with the objective medical evidence and other evidence" as well as the opinion evidence presented at Rodriguez's hearing.  (*Id.*)  In particular, the ALJ noted that Rodriguez irregularly sought out mental health treatment, "has not been getting psychiatric

treatment, nor taking medication continuously," and appeared to seek out treatment only to generate evidence for his SSI appeal. (*Id.* at 13–15.)

The ALJ pointed out that during the age 18 review period, Rodriguez "ha[d] not generally received the type of medical treatment one would expect for a totally disabled individual." (*Id.* at 13.) In fact, Rodriguez did not seek any treatment during the relevant period and only presented at UHP after the cessation of his benefits. There he "request[ed] form completion for SSI" and "denied symptoms of nervousness, depression, stress, and anxiety." (*Id.*) The following month he returned to UHP for a physical examination, which revealed that Rodriguez "had a normal affect, good eye contact, and exhibited normal speech." (*Id.*) Two months later, when he returned to UHP for a psychiatric referral he "stated that he had not been following up with a psychiatrist and 'SSI wants to close his claim.'" (*Id.* at 14.) The ALJ highlighted that it was not until February 2013 that Rodriguez was reinstated on medication and scheduled to begin therapy. (*Id.*) However, Rodriguez immediately began missing medical and therapy appointments. (*Id.*) The ALJ thus reasoned that the "missed . . . appointments, coupled with the fact that he has had only a small number of medical visits, reflect that the symptoms may not have been as serious as has been alleged in connection with this appeal." (*Id.*)

The ALJ also considered Rodriguez's wide range of reported activities of daily living, such as doing the laundry, cooking, using a phone, self-grooming, having friends and hobbies, and fighting less as he aged. (*Id.* at 15.) Finally, in reaching his RFC determination, the ALJ looked to the opinion evidence of the consultative examiner Dr. Hoffman and the state agency psychological consultant R. Nobel, to which he assigned significant weight; Dr. Hoffman found that "claimant shows adequate basic self-care skills and basic socialization skills" and R. Nobel

opined that Rodriguez "retains the mental residual functional capacity for simple task work." (*Id.* at 15–16.)

At step five, the ALJ took note of Rodriguez's age, education, work experience, and RFC. (*Id.* at 16.) *See also* 20 C.F.R. pt. 404, subpt. P, app. 2. The ALJ acknowledged that Rodriguez's ability to perform work at all exertional levels was compromised by nonexertional limitations. (*Id.*) Then, he found that Rodriguez would be capable of performing unskilled, simple, and repetitive work activities and all basic mental work activities. The ALJ concluded that Rodriguez was capable of making a successful adjustment to work that existed in significant numbers in the national economy. As such, the ALJ determined that Rodriguez was not disabled under the Social Security Act. (*Id.*)

In making his determination, the ALJ properly followed the four step analysis. His conclusions at each step were supported by substantial evidence in the record, including the evidence of gaps in Rodriguez's treatment history. *Dumas v. Schweiker*, 712 F. 2d 1545, 1553 (2d Cir. 1983) (holding that an ALJ "is entitled to rely on not only what the record says, but also what it does not say"); *see also Banks v. Astrue*, 955 F. Supp. 2d 178, 190 (W.D.N.Y. 2013) (affirming ALJ's determination where "the ALJ noted that Plaintiff's failure to seek followup treatment for alleged physical ailments contradicted his claims of total disability and severe symptoms"). Contrary to Rodriguez's assertion, the ALJ did not insert his opinions for those of medical experts, rather he properly evaluated the evidence and resolved conflicts therein – such as, the conflict between Rodriguez's statements regarding the severity of his symptoms, the fact that he only sporadically sought treatment,[3] and his extensive activities of daily living. The ALJ

---

[3] Moreover, the ALJ's conclusion that Rodriguez's conditions did not limit his ability to seek treatment is supported by substantial evidence. After Rodriguez was notified that he was no longer eligible for disability, he promptly sought out treatment at UHP after years of failing to do so despite allegedly disabling symptoms. (*Id.* at 13–15, 308–12.) This is consistent with the ALJ's finding that Rodriguez's efforts to obtain treatment were the result of his

also looked to, and credited, the largely normal exam findings from Rodriguez's UHP visits, the opinion evidence of the consultative examiner Dr. Hoffman, and the opinion evidence of the psychological consultant, R. Nobel. Accordingly, substantial evidence supports the ALJ's determination that Rodriguez is not disabled.

## II.     New Evidence Submitted to the Court

In support of his claim for disability, Rodriguez submitted new evidence to the Court. The Court "may at any time order additional evidence to be taken before [the Commissioner], but only upon a showing that there is new evidence which is material and that there is good cause for failure to incorporate such evidence into the record in a prior proceeding . . . ." 40 U.S.C. § 405(g). "Evidence is 'new' if it was not considered by the ALJ and is 'not merely cumulative of what is already in the record,' and it is 'material' if it 'is both relevant to the claimant's condition during the time period for which benefits were denied and probative.'" *Sistrunk v. Colvin*, No. 14-CV-3208 (JG), 2015 WL 403207, at *7 (E.D.N.Y. Jan. 28, 2015) (quoting *Jones v. Sullivan*, 949 F.2d 57, 60 (2d Cir. 1991)). "Materiality also requires 'a reasonable possibility that the new evidence would have influenced the [Commissioner] to decide the claimant's application differently.'" *Id.* (quoting *Jones*, 949 F.2d at 60).

Rodriguez submitted three types of new evidence: (1) medical evidence, specifically records from South Bronx, Dr. Yearwood, and the Human Resources Administration; (2) educational records; and (3) criminal evidence. Rodriguez fails to establish that this new evidence is material.

---

desire to obtain disability benefits, not symptoms of his ODD or ADHD. *See Banks*, 955 F. Supp. 2d at 190 (affirming ALJ's finding that "Plaintiff's reasons for seeking treatment damaged his credibility" where plaintiff repeatedly asked his physician "about getting a letter regarding his alleged disability for SSA" and "refused group therapy").

First, the Court finds that the records from South Bronx would not have provided a basis for the ALJ to change his findings or conclusion, or to make any alternative findings. These records serve to provide further evidence of Rodriguez's violent and aggressive tendencies; however, there was already an abundance of evidence about such behavior in the record when the ALJ made his determination. Though the actual South Bronx records were not previously available, the ALJ already had and considered evidence of Rodriguez's violent behavior and treatment at South Bronx, long before the relevant period. (*See id.* at 13–15, 34–35, 300, 352.) For example, records from Dr. Klinghoffer and UHP note that Rodriguez had attempted to harm others in the past, was on probation for fighting, got into frequent fights, and was discharged from South Bronx after breaking a door. (*Id.* at 300, 352.) Rodriguez also testified at the hearing that he fought a lot, had gotten into a fight three months ago, and had been fired from a catering job for getting into a fight with one of the other employees. (*Id.* at 31–32, 34–35.) For these reasons, the South Bronx records are cumulative of the evidence before the ALJ at the time of his decision. Thus, they do not provide the basis for remand.

The medical records from Dr. Yearwood and the Human Resources Administration also fail to satisfy the materiality requirement. These records date from December 19, 2014 to March 11, 2015, three years after the age 18 determination in 2011 and over one and a half years after the ALJ's decision. Moreover, Dr. Yearwood does not state that she is retroactively evaluating Rodriguez and it is unclear how they could relate to the relevant period. Even if they did relate to the relevant period, Dr. Yearwood noted that she could not answer multiple questions about Rodriguez's ability to perform work-related functions as they had only met on three occasions. While these records may show that Rodriguez's condition has changed since the ALJ's

determination on August 16, 2013, they do not provide the basis upon which the ALJ would decide Rodriguez's application differently.[4]

Finally, the new educational and criminal evidence is also largely cumulative of information in the record. For instance, the evidence includes a 2003 psychological evaluation. However, the record already contained a detailed psycho-educational evaluation from 2006, which was closer in time, although also prior to, the relevant age 18 review period. The record also already contained evidence relating to Rodriguez's educational history and his need for special education classes. (*Id.* at 29–30, 250–65.) In regard to the records of Rodriguez's juvenile arrests, the record already contained statements about his trouble with the law, the fact that he was on probation, and his violent tendencies. (*Id.* at 34–35, 300, 302, 352.)

As such, the new evidence presented by Rodriguez does not satisfy the materiality requirement and does not require remand.

## CONCLUSION

For the reasons herein, Rodriguez's motion for judgment on the pleadings is DENIED, the Commissioner's motion for judgment on the pleadings is GRANTED and the case is DISMISSED. The Clerk of Court is respectfully directed to enter the accompanying judgment and to close the case.

SO ORDERED.

*Roslynn R. Mauskopf*

Dated: Brooklyn, New York
      September 28, 2016

_____
ROSLYNN R. MAUSKOPF
United States District Judge

---

[4] The Court notes that this decision does not preclude Rodriguez from filing a new application for benefits based upon any alleged deterioration of his condition. *See Pantojas v. Apfel*, 87 F. Supp. 2d 334, 340 (S.D.N.Y. 2000).